Case number 20-2060 Mark Krueger v. Experian Information Solution et al. Orlargen is not to exceed 15 minutes per side. Mr. Chami for the appellant. Thank you, your honors. May it please the court. My name is David Chami. I represent the appellant along with my firm in this appeal. Unless the court has any questions off the bat, I'll go ahead and start with my argument. Thank you, your honors. Again, good afternoon. I want to start by just addressing that the lower courts ruling and obviously this panel's rejection or affirmation of that ruling will have significant consequences on all Americans, both in and outside of this circuit. With all due respect to the lower court, it appears that district court either misinterpreted the evidence in numerous places or at a minimum had a misunderstanding of the significance of or the meaning of various terms of art in the credit reporting industry. Can I ask you just an initial question? I can see where the district court had a hard time figuring out what the evidence shows because I've had a hard time figuring out what the evidence shows. So you don't have that credit report in the record. I understand that the actual credit report, do we have what was actually submitted from SINLAR to the CRAs in the record? I understand that these notes suggest that there might be inconsistent statements, some suggesting that the loan was still valid, but then the no status things. And I'm curious, like how do we even know what SINLAR told Experian and the other credit reporting agencies? Of course. And I'm not the type of attorney who comes in and says, I just got on this case right prior to the motion for summary judgment. But I will say that the testimony of Mr. Parrish, which was SINLAR's corporate representative, and which is completely in the record, goes through all of those documents very succinctly. And much of that testimony is cited in the record, is cited in the briefs. So that it doesn't appear, if you just look at SINLAR's acknowledgement of how they were reporting it in that testimony, it's pretty clear that they were reporting, they failed to report that the debt was discharged in bankruptcy. And here's one of the terms of our statute. What do you make of the, what is the no, so it seems, is it your theory that it's misleading because Mr. Parrish clearly indicated that there was the D symbol that suggested no status, which I take it to mean it was discharged. But then there's this other testimony that it also had the numbers and suggested that it may be valid. And I was having a hard time understanding what the interaction of the two, is that suggesting that what they sent was misleading because it had both, or what was it suggesting? No, and this is why I said the status itself is a term of art, because status is one of many of the various categories of information that is being reported. The status should not have been reported as no status. It should have been reported as discharged in bankruptcy. Discharge in bankruptcy is a status. Paid is a status. Transferred to another lender is a status. Here they reported no status. That is not suggestive of no updating or no reporting. In fact, Sunlar repeatedly admits that they were providing monthly information to the credit reporting agencies, not only in the context of monthly reporting, but each and every time Mr. Krueger disputed, they failed to update each and every time. And they reported changes in the balances. The balances went up. The past two balances were accruing interest, it looks like, because they were going up from $10,000 to $12,000 by the time this was over. And at a minimum, if the district court had somehow mistakenly construed that no status somehow meant no reporting or bankruptcy, then at a minimum, the failure of that information to actually notify the rest of the world that a discharge of that debt had occurred, then at a minimum, it's materially misleading under the Ankara case that was just decided by this court in 2020, which just clarified that Baggio in 2012 had already said materially misleading is inaccurate under the FCRA and the Sixth Circuit. However, we don't take the position that this is simply materially misleading. It's patently false. When you report that somebody owes $29,000 on a discharge debt, not only discharge debt, Your Honors, this is not just a debt that any context, because the lien had been stripped. It didn't even have, they didn't even have the lien on the security interest anymore. That had been stripped in the bankruptcy. So this debt ceased to exist, but they continue to report that Mr. Krueger owed $29,000, then it turned $31,000, and that he had a past due balance and was 180 days late. Settler doesn't at any point in time dispute, dispute that that information was being reported to the agencies. In fact, Mr. Parrish's testimony is in the record, and I could cite the court to numerous areas of his testimony. In fact, if you look at, you know, the record of ECF 33. If I may, just in the interest of time here, I mean, one thing I'm trying to sort out is whether your client has an actual injury for purposes of Article III standing. I mean, certainly, I think we can all sympathize with your client's, you know, reaction to this and at least, you know, viewing the facts in the favor of your client, the sort of obtuseness on the other side. But, you know, an injury, in fact, is, you know, a technical thing that you have to satisfy under Article III. You've asserted that the injury here was the bad credit report and then the mental anxiety and stress that your client suffered as a result of all this. Is that, I mean, I think that's straight from your brief. Is that a fair characterization of what you're saying is the Article III injury? Well, so yes and no, because obviously, I was, my firm was the ultimately handled a case that just was decided out of the 11th circuit called Loesch v. Nation Star Mortgage, similar. Why don't you just give me a quick yes or no about whether I identified the credit. I think, Your Honor, that informational harm, sort of like in the context of the common law defamation, in that it would also be another basis for standing a particularized injury. And that's what I want to talk to you about. I mean, so a credit score, frankly, strikes me as something different than, say, having something slanderous published in a with the example of the newspaper that people are going to read it. I mean, this is not speculative. And that a person is going to suffer reputational harm as a result, which is an interest that the law treats as cognizable. But with a credit report, I'm skeptical that that stands on its own bottom as a reputational harm. This is not disseminated widely. People, you know, namely a decision whether to provide credit. And so, yeah, so I mean, you know, it seems like a means to getting credit as opposed to a reputational harm itself. And so when your client did not seek credit, I'm struggling to see how that is. The credit score alone is an Article 3 injury. So, Your Honor, the fact that the reputational harm translates into a credit score, meaning you tell somebody that I am deadbeat, I don't pay my bills, I owe this money, I'm past due, that is transmitted by the bureaus by way of a lower credit score, which means I'm a bad credit risk, which means I can't get credit, which means in this case, Mr. Kruger specifically saw that 515 credit score and said, I'm not going to apply for credit. I don't want to increase my injury by having, going out and repeatedly seeking credit that I won't obtain, which bears, which turned out to be true because as soon as the Sanmar trade line was removed. Just because we're short on time, I really apologize for interrupting you. Is there a case that you can point us to where a plaintiff under this statute, his failure to seek, sort of being chilled from even applying, amounted to an actual injury? Off the top of my head, the case that I was involved in is Loesch v. Nation Star Mortgage. It's 11th Circuit, 2021. It's 995 F3rd 937. It doesn't necessarily say that on exactly, but it talks about credit score and reputational harm and the decreased credit score. So it's analogous on all of those points. I don't think it addresses the chilling effect per se. Well, I'll take a look at that. Thank you. Your time's up, Mr. Chami. You'll have your five minutes rebuttal. Thank you, Your Honor. Mr. Jacobs. Yes. Good afternoon, Your Honor. May it please the Court. Stephen Jacobs appearing on behalf of Sanmar. This is a case that I believe turns more heavily on the facts and the damages more than the analysis of the law itself as presented by the Appellant's Counsel here. I do believe that the case is more unique compared to many other cases that this circuit and other... I can see why you might want to turn our attention from your client's conduct because your client was pretty... I mean, it was providing information that was dead wrong for a prolonged period of time despite the fact that your error was called to your attention numerous times. What do you have to say about that? Well, there's a couple of different things. So first off, when you take a look at all the information, and I don't believe that the documents that are called the ACDVs, which are these when a dispute is made by a borrower or a debtor, that form is sent over to the furnisher of the dispute codes, then generally a brief explanation as to what that information, what is actually being disputed. And so we have here, we have, there's a little bit of dispute. Wouldn't discharged in bankruptcy be a pretty common notation that you would make on one of those forms? Because many debts are discharged in bankruptcy. Isn't that part of your code, put your set of codes? I believe it is. I don't know that Mr. Parrish had testified exactly to that. Well, why was it so hard to get it right when the debt had in fact been discharged in bankruptcy? Well, the debt was discharged in January of, January 23rd, I believe, of 2018 when he completed the, when he completed the discharge or the bankruptcy discharge and completed his Chapter 13 plan. So, but what had happened though, is that a couple of the credit reporting agencies, the information was corrected. So it wasn't as, as uniform as suggested by, by Appellant's Council that we have Equifax, we have TransUnion, and we have Experian. All three, all three credit reporting agencies had received a dispute. And the Equifax one was corrected earliest on in, I believe, March of 2018. And then the TransUnion one, after a dispute, was then corrected with the trade line being updated with a zero balance. So it was the Experian disputes or the credit. When did the second correction happen? The second correction happened May of 2018 for TransUnion. How long did it get, take to resolve the third one? The third one was, which would have been Experian, that was corrected finally January of 2019 prior to this lawsuit being completed when all of the entire loan was removed from the credit report. Can I ask, what did, what did you make of Parrish's testimony about the, did you agree with the representation that it's undisputed, that it was repeatedly reported inaccurately? Parrish, I was confused by Parrish's deposition testimony because at times he clearly seemed to concede that there was inaccurate information in your system, but he also suggested that there was this no status thing and he seemed to think that that meant that there was, it was reported discharged. Do you dispute the other side's contention that that's inaccurate and it is essentially undisputed that it was reported wrongly? Yeah, so there is, to kind of clarify, yes, Mr. Parrish's testimony. So we have this no status thing and this is for the payment history as it relates to credit reporting and there's different indicators that are used. D stands for no status or no reporting, meaning there's no change from the previous month and that actually continued from when the loan was boarded in 2014 for the bankruptcy all the way through until it was actually removed from the credit reporting in that. Yes, although we see, we recognize that the trade line show did not say a zero balance for, let's say, the Experian credit report that was provided and that the ACDV did show that he was, Mr. Kruger was behind. In Sunlar's system, the bankruptcy information wasn't completed. So when they go through their protocol of researching and dispute, one of the things that they do was they would go to the bankruptcy module and take a look at what does that particular screener department reporting. And what was happening was that, and Mr. Parrish had testified to this, was that he was, or Sunlar was trying or working on charging off in this lien through the public records. And there was a delay in doing this. And so there was a delay in updating its internal system, that bankruptcy system that the credit reporting analyst would have taken a look at, which is what caused. I just really am curious about bottom line conclusion when Mr. Parrish repeatedly said to statements about how the report of 29,000 to 31,000, he repeatedly conceded that that was inaccurate. That's essentially conceding that they were sending along inaccurate information. Yes. I mean, Mr. Parrish, he did concede that in the questioning that from Sunlar's perspective, that information was not correct. It understood that he did receive a bankruptcy discharge and they had no intention of attempting to collect upon him. It was just that it was taking longer to complete the entire process of discharging the lien, which is part of the record. I had attached it in the lower part showing that there was a discharge. Can we switch to article three standing? Because I did read the Loesch case and it seems to set forth a legal rule that reporting misinformation to a credit report is analogous to defamation per se of reporting that somebody just has bad credit or is kind of a deadbeat when it comes to paying one's debts. That was traditionally seen as a per se injury under the defamation law and suggested that just the false reporting was itself enough. I would think if that legal rule applies here, it would establish article three standing. Do you attempt to distinguish it somehow? Well, I do disagree with the Loesch decision, respectfully, of course. But the fact that information is being furnished improperly to the credit reporting agency and comparing it to defamation, where we know that defamation is something that is more broadcast, right? And when it's actually information that's disseminated to others that is heard by others. Here we don't have that. We don't have that type of information tonight. And I think that in this age of a consumer reporting and when we're talking about emotional damages and those types of things, I still believe that the courts need to follow a strong line towards causation. What is the causation and what are the damages? And I believe that actually when we look at this court's opinion from Buchholz v. Tanning, that actually provides a very good guideline for when we're dealing with these types of situations. Because I really equate Mr. Krueger as, and by the way, very nice man, and I can sympathize with him, and all of our personal experiences, I understand it. But Mr. Krueger, when you look at his entire testimony, he understood very clearly that the bankruptcy in and of itself was going to create credit issues for him. He was very well prepared for this. He's a very diligent person, very sophisticated, very knowledgeable, and he understood the complexities of the bankruptcy itself and what type of impact that would have on his immediate future. What about the opportunity cost for him? That's another, Loesch also talks about opportunity costs being an Article III injury. So practicing lawyers know well the value of a billable hour. The time it takes for him to repeatedly attempt to rectify this can actually be put, if he was a lawyer, into billable hours, right? So why wouldn't the opportunity cost of his time of having to call what he claims 10 or 12 times to try to rectify this, why isn't that an injury? I would think that that's a tangible injury. Instead of, even if it's not, I would have went to work, I would have spent more time with my kids, I would have done this. Instead I have to get on this telephone and perhaps he had to wait for like a half hour until he got somebody to talk to. Why isn't that opportunity cost type injury enough since there were so many times in which he had to try to rectify the problem? Well, I don't believe that he actually ever testified to any amount of time or loss of time as it relates to this. I believe all of them were indirect online disputes that were provided through Mint or Credit Karma, I believe is what his testimony was. You don't disagree with the premise that it could be, it's just the facts fall short. Well, the facts, I believe, yeah, the facts fall short in many respects in this particular case, but no, I'm not necessarily conceding that that is a tangible harm. I still feel that something like that is going to fall into the intangible category because we all deal with, in our lives, different aspects of our lives that are going to be challenges. Not everything, I believe, is categorized into a tangible situation. I still believe that it falls into the intangibles. What about the shifting gears a little bit to another element of damages? What about the testimony of emotional harm that actually manifested in physical symptoms? What about that? Yes, so Mr. Kruger testified that he did receive, he manifested a physical tick and he had described it to me. He had testified that it happened in February or March of 2018. His bankruptcy discharge happened on January 23rd of 2018, and he did not submit his first dispute to the credit reporting until the end of 2018. Now, contrast that with, and it is part of the record, I did cite to it, his wife testified that he had developed an earlier tick during the course of the bankruptcy. Doesn't this go though to whether, I mean, if the case went to the jury ultimately, isn't your response geared to arguing to the jury that this wasn't very significant and should not entitle him to much compensation? I mean, I'm really asking not a question about the jury argument about this, but I'm asking a question about whether as a matter of law, the claim of physical harm changes the legal situation. Well, it could, but we don't really have causation here. Don't we have to have causation? Assume causation. I'm talking now about standing and can he proceed given this assortment of claims. I mean, there's the thing Judge Kethledge asked you about. There's the thing Judge Murphy asked you about. A couple of things Judge Murphy asked you about. Now, I'm asking you about something else in that same vein. Yes, Your Honor. I mean, yes, certainly. I mean, I would certainly argue that any damages would be physical harm plus the other things resolves the issue of whether he has standing. I would say yes, it would. In the plaintiff's favor? It could. It could. Let me ask you, can I ask a question? Sure. In the same vein, let's say we construe the plaintiff's testimony to mean that he chose not to pursue an auto loan that he otherwise would have pursued because he saw that his credit score was suppressed as a result of the $10,000 outstanding balance. Isn't that a cognizable harm under this statute in particular? I don't know if it should. I mean, the problem that I foresee with something like that is how do you, because of the way credit reporting and all the various agencies and all the different relationship, how do we know where this information is coming from? For example, if one credit reporting agency doesn't have a relationship with another vendor, but yet this other credit reporting agency does have a relationship and is reporting a little bit higher credit score, how is that, how do you reconcile those types of issues? At least on the record that we have to deal with, it was your client who was providing the wrong information. That doesn't seem to be an issue here. Do you want to respond to that? Your time's up, but you certainly can respond to Judge Kethledge. I mean, Judge, I'd like to respond. I guess I'm a little confused. So what I'm saying, and I want to give you a chance to tell me I'm wrong, honestly. It would seem that your client basically undisputedly provided wrong information to credit reporting agencies, which caused a $10,000 balance past due to persist on Mr. Kruger's credit, which arguably caused him not to seek an auto loan, notwithstanding that his cars were old and having trouble, because his credit score was reduced. And so if the opportunity cost, so to speak, here is that he didn't apply for credit, doesn't that count as a harm, particularly a statute that it would seem obviously is trying to avoid precisely this outcome? Okay, I understand. Yes, I do think that that could fall into the category of an opportunity cost. I don't believe the evidence supports it in this case, because the evidence points in another direction that Mr. Kruger actually understood everything that he was going to do. And what this bankruptcy element to factor in there, and my client as the furnisher of the information doesn't score the credit. It just provides the information. It's actually the credit reporting agency that actually scores. Okay. Thank you. I appreciate your answer. All right. Mr. Chami, you have five minutes for rebuttal. Thank you, Your Honors. Just a quick response to that. I Mr. Kruger's credit, because as soon as it was removed, his score went up 100 points and he applied for credit and was approved. So I think there's sufficient evidence in the record that we could directly point to the inaccuracies by Sunlar to show that it did in fact cause harm because the score went up 100 points and that he would have pursued credit because as soon as it was off within a few months, he did apply for credit and was approved for that credit. But I also want to comment on some of the earlier statements made by counsel, because he said that the information was corrected very early by Equifax. I want to point the court's attention to the brief appellee's brief where they identify six instances of disputes. The earliest one being March of 2014. Whereas if you look at the record at DCF 35 at 457, page ID 457 or 454, I'm sorry, it's clear that Mr. Kruger disputed in February, February 21st of 2021. And that is identified in their own notes. They received an eOscar dispute from Mr. Kruger. So he was disputing not in late 2018 as counsel suggested, but his first dispute was one month after the discharge. And in the record, in their notes, there is evidence of 10 separate and distinct eOscar disputes being received by SEMLR. So an individual, he also called them, it's also in their notes on February 22nd of 2021. So he called them directly trying to resolve this and he disputed it 10 separate times. However, the characterization that it was corrected is false. Equifax on their own deleted the entire trade line in March of 2021, or 2018, my apologies. TransUnion on their own, not because of anything that SEMLR provided, changed the reporting to include it in bankruptcy, but the record reflects that it later reported the derogatory information again in 20, later in 2018 and 2019, that that information reappeared. TransUnion was also a defendant in this case for that very reason, because after they corrected it, the information provided by SEMLR was again, the same as it had provided to Experian. SEMLR provided the same information to all three credit bureaus. That's how the credit reporting works. They don't send different data three different times. It's one thing through eOscar to all three bureaus. So they were supplying inaccurate information to all three bureaus every single time, just some of the bureaus suppressed. Mr. Chamey. It feels really odd having to raise my hand to get permission to speak from a lawyer. It's not your fault. Nevertheless. It's odd to talk to this like thing here and not look at you too, so. Are these, I seem to recall and my memory's a bit fuzzy, but we don't have documents that we can use to look at all these different reports and so on and so forth. Are we limited by the absence of documents to the testimony or am I confused and misremembering? No, I think a number of the ACDBs are only discussed in the deposition and were not attached to the record. You know, judges like to look at stuff that's concrete and it always loses something when you're having to rely on the testimony without looking at what it is that's being testified about. Primary sources. That's what we like. Thought for the future. I'm understood. I do want to point to Leisch v. Levy 854 F3rd 856, which is the Sixth Circuit opinion that discusses, I think Your Honor had asked about, the particularized harm and informational harm. And there is some Sixth Circuit authority on standing related to FCRA cases. Can I ask you about the statutory scheme? I know your time is up pretty close. Is it your understanding that the cause of action here, the provision that prohibits providing false information to a credit reporting agency or requires, excuse me, requires accurate information to a credit reporting agency is in a portion of the statute that isn't actually covered by the cause of act or the private right of action. So that's why you have to rely on the investigation provision. It's not like per se liability for providing false information, because that doesn't fall within the cause of action. You have to show an unreasonable investigation. That is right, Your Honor. And here, and this is one of the points I was going to make. This is the only remedy Mr. Kruger has. If you report inaccurate information about him, he has no other remedy other than the FCRA Act. Against the Furniture Act 1681 S2B, which requires a dispute. He disputed 10 times. They had 10 opportunities to fix it. And they never did. When it finally came off the credit reports, it's because it aged off. That's it. All right. If there are no other questions, we thank you both for your argument. We'll consider the case carefully. Thank you. Thank you, Your Honor. Thank you.